Marshall, C. J.
 

 These controversies call for construction and interpretation of many provisions
 
 *468
 
 of the school laws of the state, more especially certain enactments of the 85th General Assembly as found in 110 Ohio Laws, pp. 315, 324 and 456. These laws make sweeping changes in the laws theretofore existing pertaining to school administration and the creation and incurring of indebtédness of political subdivisions of the state. They are enacted under authority of Section 2, Art. VT of the Constitution, which provides, in part, as follows:
 

 “The General Assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state.”
 

 Pursuant to this power the Legislature, by virtue of Section 7644, General Code, has designed to provide for free education of the youths of school age for a period of not less than 32 weeks in each year. By virtue of Section 7763 all children between the ages of 6 and 18 years are of school age, and by virtue of that section and Section 7762-6 school attendance is compulsory unless children come within certain stated exceptions. Section 7764-1 requires boards of education to provide high school work for pupils who have finished the elementary course, and, if such high school work is not provided within four miles of the residence of such pupils, then, by virtue of Section 7749-2, transportation or board and lodging must be furnished to such pupils. Many other provisions are made, all of which involve much greater expense than heretofore incurred in school administration, and it is designed by the amendments of the
 
 *469
 
 Eighty-fifth General Assembly to make provision for such additional expenses, and it was evidently the legislative intent in these amendments to keep the schools open in all districts of the state by means of additional levies np to certain limits, the balance to be provided for by participation in a state educational equalization fund, created by Section 7595, General Code, placed under the administration of the state director of education. It is contended, on one hand, that, by virtue of the constitutional provisions aforesaid, the powers of the Legislature are unlimited and unmodified by any other provisions found in the Ohio Constitution. The parties to these controversies differ not only as to the extent of legislative power, but also as to the interpretation of those laws which are concededly within the limits of legislative power.
 

 The pleadings in cause No. 18397 present several legal questions:
 

 First. Must' this entire proceeding fail because the request for state aid was not made prior to July 31, 1923?
 

 This question turns upon the construction of Section 7595-1, General Code, as amended by 110 Ohio Laws, p. 315, which in its pertinent parts reads as follows:
 

 “The board of education of any school district of a county school district * * * may at any time prior to July 31 of any year apply to the director of education for participation in the state educational equalization fund for the ensuing school year.”
 

 It is contended that, since permission is given to make such request prior to July 31, it is neces
 
 *470
 
 sarily implied that such request may not be made after that time. It is not easy to perceive why that particular date was fixed by the Legislature, unless it seemed desirable that the request should be made prior to that time in order to permit all of the other necessary steps to be taken in an orderly manner, so that levies might be made to comply with Section 7596-1, General Code, and to avoid the possible necessity of borrowing money, and perhaps for other reasons. On the other hand, it does not seem that the Legislature could have intended that the mere failure to make the application before July 31, or the difficulty of foreseeing at that time the necessity for state aid, should absolutely preclude steps which would thereafter be found necessary in order to apply for and receive state aid. That statute is clearly not one where time is of the essence of the matter, or where the rights of any person or class of persons would be prejudiced by delay, and it is apparent that the only difficulty which arises out of the failure to make the application before July 31 is that it causes a considerable volume of additional labor on the part of the county auditor. It may very well happen that the local board would be indifferent about the matter, and it may be, as has in fact happened, as shown by the pleadings in these cases, that the taxpayers would desire to avoid the additional 3-mill levy, and there might be a conspiracy whereby the application was purposely delayed in order to attempt to defeat the law. In all such cases those officials and school patrons who are interested in having the schools maintained should not have their rights defeated by inadvertence or design.
 

 
 *471
 
 This proposition is governed by the same principles which were before this court in the case of
 
 State, ex rel. Alcorn,
 
 v.
 
 Mittendorf et al., Com’rs.,
 
 102 Ohio St., 229, 131 N. E., 158, and upon the authority of that case this question will be answered in the negative.
 

 Second. Is the right of the county board of education to levy the additional taxes, after the tax duplicates have been completed and the rates of taxation published, and other statutory steps taken by the county auditor, defeated because of the mandatory duties imposed upon the county auditor by the Code sections hereinbefore referred to?
 

 Our answer to this proposition is that the tax duplicate is not unalterable, and that no matter how difficult it may be to make additions and changes, and no matter how much additional labor may be involved in making changes, and no matter how many complications may arise as a result of changes, the same legislative authority which imposed the original duties upon the county auditof may impose additional duties upon that official, and the statutes subsequently enacted imposing the additional duties will necessarily
 
 pro tanto
 
 override the former statutes.
 

 This proposition has been fully met in the case of
 
 State, ex rel. Donahey, And.,
 
 v.
 
 Roose, Aud.,
 
 90 Ohio St., 345, 107 N. E., 760. Other cases which answer the contentions of the county auditor are as follows:
 
 Insurance Co.
 
 v.
 
 Cappellar,
 
 38 Ohio St., 560, and
 
 State, ex rel.,
 
 v.
 
 Raine,
 
 47 Ohio St., 447, 25 N. E., 54. This question must therefore be answered in the negative.
 

 It is further contended that, by reason of the
 
 *472
 
 fact that the budget commissioners in several counties have completed their work, there can be no further and additional levies thereafter, and that that fact becomes an additional reason why the 3-mill additional levy for school purposes cannot be made after the work of the budget commission has been completed. It is a complete answer to this contention that such 3-mill additional levy is not under the control of the budget commission, because by virtue of Section 5649-4 such additional levy is made an emergency, and therefore not sub ject to any limitations, and no further adjustments of levies need be made by the budget commission as a result thereof. Section 7596-1 is not, therefore, limited by the provisions of Sections 5649-36 and 5649-3c.
 

 It is further pointed out that persons owning real estate might pay all the taxes levied and assessed at the time of the first collection on December 20, and then convey their property by deed of general warranty, thereby creating a confusion between the seller and the purchaser as to the obligations of the warranty. It is not necessary in this proceeding to attempt to answer that question, and it must be left to a determination between parties having such a controversy. These and other considerations only tend to show the difficulties which arise out of modifications of tax levies after October 1, but do not show that such difficulties are insurmountable or beyond the power of the Legislature.
 

 Third. Does the state director of education have authority under Section 7596-1, or under any other statutes, to direct the board of education
 
 *473
 
 to levy additional taxes upon the property of any school district, except in cases where an additional levy of three mills would fail to provide sufficient funds to operate the schools for the period of 32 weeks without state aid?
 

 Our attention has not been directed to any statute on this subject other than Section 7596-1, General Code, the pertinent part of which we quote:
 

 “In ease the statements presented in accordance with Section 7595-1 and the examinations directed by Sections 7595-2 and 7596 prove that the board of education in question has failed to put to a vote the proposition to levy additional taxes above certain tax limitations in order that the levy may meet the requirements for the district to share in the state educational equalization fund, or that the district has voted upon such proposition and has failed to give it the necessary majority,
 
 the director of education upon ascertaining such action to be necessary to enable the district to receive the sum from the state educational equalization fund necessary to maintain the schools for eight months in the year
 
 shall direct the county board of education to levy the additional taxes on the property of the given village or rural school district necessary for such purpose and the county board of education shall be empowered to levy such additional taxes.”
 

 It requires no analysis of the foregoing quoted portions of that section, and especially that portion thereof which we have italicized, to show that the section does not by its terms give the state director of education any power or authority over county boards of education, except in those cases
 
 *474
 
 where state aid will eventually he needed to keep the schools in operation. The language clearly shows that the power to direct the county board of education to levy additional taxes was reposed in the state director for the sole purpose of requiring the complete exhaustion of taxation levies in order to place the school districts in position to make request for state aid and in order to comply with conditions precedent thereto.
 

 The stipulation having admitted that the additional 3-mill levy will produce sufficient funds to maintain the schools to the end of the school year, and the language of Section 7596-1 being plain, no reason is shown for awarding the peremptory writ of mandamus.
 

 This branch of the case therefore loses its character as a legal question, and must be disposed of by the determination of the fact against the relator and in favor of the state director of education. It follows that, if the state director of education cannot be ordered to direct the county board of education to make the levy, this court is likewise powerless to make any order upon the county board of education to make such levy independently of any direction on the part of the state director of education.
 

 Fourth. Has the board of education of Miami county power and authority to borrow money to maintain in operation the schools of Newton township school district upon the credit of that district, in anticipation of the collection of current revenues for the year 1923?
 

 All parties to this litigation contend, and it is not doubted by this court, that the General Assem
 
 *475
 
 bly has power under the Constitution to authorize any board of education to borrow money in anticipation of the collection of current revenues. The only question before this court for determination at this time is whether the Legislature has conferred upon county boards of education such power, which can be exercised at this time. If such power exists it must be by virtue of Sections 5655 and 7596-1, General Code. The pertinent part of Section 5655 is as follows:
 

 “In anticipation of the collection of current revenues in any fiscal year * * * the board of education of any school district * * * may borrow money and issue certificates of indebtedness therefor, but no loans shall be made to exceed the amount estimated to be actually received from taxes and other current revenues for such fiscal year, after deducting all advances. * * * Provided that after January 1, 1924, no board of education shall borrow money in anticipation of the funds to be received at, or in advance of, the August settlement with the county auditor,”
 

 It is contended by the relator, and also by the Attorney General, that “the board of education of any school district” does not refer to a county board of education, and that it refers only to those boards of education which levy and collect taxes, and it is sought to justify this view by referring to the language “in anticipation of the collection of current revenues in any fiscal year.”
 

 Section 4679, General Code, as amended by 109 Ohio Laws, p. 552, classifies school districts and reads as follows:
 

 “The school districts of the state shall be styled,
 
 *476
 
 respectively, city school districts, exempted village school districts, village school districts, rural school districts, and county school districts.”
 

 It is apparent, therefore, that there is such a thing as a county school district, and therefore a board of education of a county school district. Section 5655, therefore, very clearly gave a county board of education the power to borrow money, and as clearly took that power away by the proviso that it should not borrow money after January 1, 1924. The language of the proviso is so plain and clear and free from ambiguity that this court, without reading into the statute something which the Legislature omitted, could not say that its prohibition would not apply to a county board of education.
 

 Section 7596-1, General Code, reads in its pertinent parts as follows:
 

 “In addition to the powers conferred in Section 7510-1 [7610-1], the county board of education shall have the power, if necessary to maintain in operation the schools of any school district of the county school district, with the advice and consent of the director of education, to borrow money on the credit of that village or rural school district, with like powers in respect thereto to those conferred by Section 5655 of the General Code, upon the village or rural board of education.”
 

 It is admitted on all sides and not doubted by this court that the county board could, if authorized by legislative act, borrow money on the credit of the village or rural school district in anticipation of the collection of current revenues, and the
 
 *477
 
 only question is whether this section confers such power.
 

 It will he seen that this latter section contains the language “with like powers in respect thereto to those conferred by Section 5655 of the General Code.” This reference very clearly points back to the provisions of the former section, and gives to the county board of education just such power as it already had by virtue of the former section, and that power is conferred subject to the conditions and limitations stated in the proviso of that section. If we should hold that Section 5655 was not intended to include county boards of education, because they have no current revenues to anticipate, and if we should therefore hold that the only power conferred upon county boards of education is that given by Section 7596-1, we would nevertheless be compelled to conclude that the power conferred by Section 7596-1 is the same power conferred by Section 5655, and subject to the same limitations stated in the proviso of that section.
 

 It is further pointed out that Section 5655 is found in House Bill No. 599, and that Section 7596-1 is found in House Bill No. 624. We are unable to see how this has any controlling influence. Both sections become parts of the School Code. They are
 
 in pari materia,
 
 and must be construed together, and effect given to each and every part of both sections, including the proviso. Both bills were passed on the same day, to-wit, April 6, 1923. Both were filed in the office of the secretary of state April 27, 1923, and the stipulation is exactly the same as though the two bills had been consolidated and passed as a single act.
 

 
 *478
 
 If we consider all of the sections of both acts in construing these sections and in determining the power of county boards of education to borrow money, we must construe those acts in connection with House Bill No. 202 (110 O.. L., 456) to regulate the creation or incurring of indebtedness of political subdivisions of this state.. It is apparent from a comprehensive survey of all these acts that the underlying purpose of the Legislature was to place the schools of the state upon a sound financial basis, and to prevent anticipation of the collection of revenues after January 1, 1924. It was evidently believed by the Legislature that the system then provided whereby state aid might be furnished would place the entire school system upon the “pay as you go” basis.
 

 This view is still further strengthened by the fact that Section 5656 was repealed (110 Ohio Laws, p. 326), thereby taking' away all power to extend the time of payment of indebtedness of boards of education.
 

 In placing this construction upon the statutory provisions relating to the power of boards of education to borrow money, we fully realize that it is taking away the last hope of many of the school districts of the state to maintain their schools in operation. And yet it must be realized, on the other hand, that the majority of those schools which may have to close may properly charge their difficulties to the fact that they failed to approve the proposition for additional levies at the polls. In many districts where the schools will close the fault is probably not chargeable in any sense to
 
 *479
 
 the people of the respective districts, but solely to an oversight iu this legislation, which this court is unable to supply. This question must therefore be answered in the negative.
 

 Fifth. May the county board of education be ordered to pay the salaries of teachers, and other expenses of school administration, out of the general fund of the county treasury, and upon such orders may the county auditor be ordered to issue warrants upon the county fund?
 

 The answer of the auditor in cause No. 18397 is that there is not sufficient money in the county fund of Miami county to meet the obligations of the schools in plaintiff’s district, and other districts in Miami county which are in similar financial straits, and also to meet other lawful demands upon the county fund in payment of salaries of county officers and supplies for county purposes, and that no proper provision has been made in the levy of taxes by the board of county commissioners of Miami county to meet such additional obligation imposed by the provisions of Section 7610-1, General Code.
 

 It is clearly settled by the decisions of this court that the extraordinary writ of mandamus will not be awarded except it be shown that there is a clear right, and therefore a clear legal duty, on the part of the defendant, and this court is therefore not able to say that the plaintiff has established by the requisite degree of proof that there is a clear legal duty on the part of either the county board of education or the county auditor of Miami county to
 
 *480
 
 entitle him to the relief prayed for as against those defendants.
 

 We have reached all these conclusions in a discussion of No. 18397, but it follows that the conclusion reached on the fourth question herein discussed is decisive of cause No. 18400.
 

 The peremptory writ of mandamus will therefore be denied in both eases.
 

 Writs denied.
 

 Robinson, Jones, Matthias, Day and Allen, JJ., concur.
 

 Wanamaker, J., not participating.